The JARBET COMPANY, Inc.

v.

Vinnie MOORE et al.

No. 6791.

Court of Civil Appeals of Texas.

Beaumont.

Nov. 18, 1965.

Rehearing Denied Dec. 8, 1965.

Bailey & Williams, Dallas, for appellant.

Rex Houston, Henderson, for appellees.

PARKER, Justice.

Appellees are Vinnie Moore, individually and as independent executrix of the will of J. O. Moore, deceased, and the children of J. O. Moore, deceased. Appellant is The Jarbet Company, Inc. This is a suit brought by appellees against appellant, a road contractor, for money damages arising out of the collision between a pickup truck of J. O. Moore, deceased, and an automobile operated by Mrs. Dorothy Loving, which occurred in the intersection of Highway 58 and Loop 287 in Lufkin, Angelina County, Texas, within the area of a highway construction contract between appellant and The State of Texas. J. O. Moore died as a result of the collision and his wife, Mrs. Vinnie Moore, was injured as a result of the collision. The jury found appellant responsible for various acts and omissions constituting negligence and the proximate cause of the collision in question. The jury also found that the drivers of both vehicles were not responsible for any act or omission which would constitute negligence, proximately causing the collision in question. Judgment was entered for appellees upon their motion for judgment on the verdict of the jury. Appellant filed a motion to disregard the jury's answers to certain special issues and for judgment non obstante veredicto. Appellant's said motion was refused.

On February 13, 1961, a contract was entered into by The State of Texas, represented by the State Highway Engineer, with The Jarbet Company, Inc. Jarbet agreed to construct Loop 287, a highway through timberland where no road had been. The Loop was designed to route traffic through the south part of Lufkin in an easterly direction from the Houston Highway (Highway 59) to connect with the Lufkin-Beaumont Highway (Highway 69). The roadway to be constructed totaled over 13,000 feet. Approximately midway between Highway 69 and Highway 59 it crossed Highway 58, the latter running north and south from Lufkin. Loop 287 ran east and west. In the contract Jarbet agreed to handle traf-

fic during construction, it being the entire responsibility of The Jarbet Company for the passage of traffic in comfort and safety at all times, the parts of such contract dealing with traffic being as follows:

*7.7. Public Safety and Convenience.* The safety of the public and the convenience of traffic shall be regarded as of prime importance during construction. The Department will maintain independent detours, as shown on plans, and the contractor will not be responsible for the maintenance and direction of traffic thereon. In all other respects, public safety and convenience and provisions therefor, made necessary by the work, shall be the direct responsibility of the Contractor and shall be performed at his entire expense.

* * * The Contractor shall cooperate with the Engineer in the regulation of traffic and shall so govern his work that when necessary to suspend construction for a considerable time, the roadway may be opened to public travel.

## SPECIAL PROVISION

## "DETOURS, BARRICADES, WARNING SIGNS, SEQUENCE OF WORK, ETC."

The Contractor's particular attention is directed to requirements of Item 7, "Legal Relations and Responsibilities to the Public," of the Standard Specifications. In addition to these requirements the following provisions shall also govern on this contract.

1. Due to the lack of satisfactory detours, traffic must be handled over the project during construction, and it shall be the entire responsibility of the Contractor to provide for the passage of traffic in comfort and safety at all times. No equipment or material shall be left in a position over night that will endanger traffic.

2. The Contractor shall plan and execute his operations in a manner that will cause the minimum interference with traffic during each phase of the several construction operations. The Contractor's plans of operation, sequence of work and methods of providing for the safe passage of traffic shall be outlined to the Engineer before the proposed plan is placed into operation and shall be subject to the approval of the Engineer. If, at any time during the construction, the proposed plan of operation does not accomplish the intended purpose, due to changes in weather or any other condition affecting the safe handling of traffic, the Contractor shall immediately change the plan or sequence of operations to the extent necessary to correct the unsatisfactory conditions. Where dust is created by traffic, sprinkling shall be performed as directed.

3. The Contractor shall at all times provide for egress and ingress to private property where existing facilities cannot be used due to construction operations.

4. All construction traffic shall be regulated so as to cause a minimum of inconvenience to the traveling public. At points where it is necessary for trucks or other equipment to stop and unload, warning signs and flagmen shall be provided as necessary to adequately protect public travel.

5. The Contractor shall provide and maintain standard barricades and signs in accordance with the Standard Specifications, Title Sheet and Standard Sheets for Barricades and Warning Signs included in the plans in such manner as to adequately protect and safeguard traffic at all times. All barricades and signs to remain in place at night shall be illuminated by lights between sunrise and sunset.

6. The Contractor shall provide and maintain flagmen at such points and for such periods of time as may be required to provide for the safety and convenience of public travel and Contractor's personnel, and as directed by the Engineer. Flagmen shall be English speaking, courteous, well informed, physically and mentally able effectually to perform their duties in safeguarding and directing traffic and protecting the work, and shall be neatly attired and groomed at all times when on duty. Flagman shall use the standard flags and signals shown in "Instructions to Flagmen," published by the Texas Highway Department when directing traffic.

On Page 2.2 of the contract, under Paragraph D-14 appears the safety and accident prevention provisions. "In the performance of this contract, the contractor shall comply with all applicable federal, state and local laws, governing safety, health and sanitation. The contractor shall provide all safeguards, safety devices and protective equipment and take any other needed actions, on his own responsibility or as the contracting officer may determine, reasonably necessary to protect the life and health of employees on the job and the safety of the public and to protect property in connection with the performance of the work covered by the contract."

The collision between Mr. Moore's pickup truck and Mrs. Loving's automobile occurred within the area of construction of Loop 287 where Highway 58 crosses Loop 287. At the time of the collision, The Jarbet Company had not completed its contract and was in control of the Loop 287 job and the intersection in question. On August 27, 1962, at approximately 8:30 a. m., J. O. Moore and his wife, Mrs. Vinnie Moore, were driving south on Highway 58 in their 1954 Chevrolet pickup truck. Mr. Moore was driving, Mrs. Moore riding as a passenger seated on the right side. They were traveling at some 30 miles per hour on the right hand side of Highway 58 and were some 50 feet within the limits of Loop 287 when the collision occurred with a westbound automobile, a 1962 Oldsmobile, of Mrs. Dorothy Ivey Loving. Mrs. Loving was traveling on the south side of her lane for westbound traffic.

In approaching the intersection from the east Mrs. Loving traveled up a slight elevation having a rise of about five feet in some 800 feet. The view of the drivers moving toward the intersection immediately before the collision was obstructed by woods, underbrush and a mound of dirt two or more feet in height. Mr. Moore before entering the intersection would have his view to his left obstructed by trees, growth and the mound of dirt to his left. Loop 287 was a new road. Highway 58 was an old established highway. The intersection in question was a new intersection. Prior to the construction of this intersection there had been no intersection within 1,000 feet of this one. At the time of the collision the entire intersection whether you were looking at it from the north, south, east or west was of the same white coloring. "It was the same color" as the driver viewed it from whatever direction he was approaching the intersection. Before Mrs. Loving reached the intersection she saw no signs or barricades of any kind or any sign whatever that the highway was under construction. She had traveled on 287 approximately a mile from Highway 69 without crossing any streets or roads before she reached Highway 58. She didn't know that Farm Road 58 crossed Loop 287 and she couldn't see there was a Highway 58 as she approached the intersection on an upgrade with the respective roadbeds having the same color. There was no road equipment and no workmen to call Mrs. Loving's attention to the intersection or the fact that construction was going on. To her right as she approached the intersection she could see nothing other than 287, trees and bushes. The same was true as to her left. She couldn't see any part of a road

to the right or left of Loop 287 as she approached the intersection. While traveling about 40 m. p. h., she saw Mr. Moore's car for the first time when it was some ten feet from her, put on her brakes, sounded the horn with her elbow and the collision occurred. She did not think Mr. Moore was traveling any faster than she was. Referring to Mr. Moore's driving of the truck, Mrs. Loving testified that so far as she could tell he made a normal drive and did not do anything out of the ordinary. There was not a thing either one could do to prevent the collision.

During the two or three weeks prior to the accident, the Loop had been open to traffic which was increasing in volume. Mrs. Gail Courtney testified during that time she heard the screeching of brakes at the intersection on numerous occasions. "Just as if you were running into a stop sign or stop light and suddenly see it and slam on your brakes." At that time the intersection was not clearly visible to strange drivers approaching it. She was at her home 150 yards north of the intersection when the collision occurred at which time she heard a screeching of brakes and then a crash.

Trailing Mr. Moore as he approached the intersection was the witness, Mrs. Joe Tilley, who saw the collision. She was driving 30 m. p. h. down Highway 58 in a southerly direction toward the intersection, keeping up with the pickup of Moore's in front of her. She was about 2½ carlengths behind Mr. Moore and did not see Mrs. Loving approaching the intersection on 287 from the east until practically at the same time the collision occurred because "you couldn't see too good through there, you know." Mr. Moore had poor sight in his left eye, but had been driving a car for 50 years with that same condition. A photograph of the intersection looking down Highway 58 from the same direction in which Mr. Moore was traveling shows the very limited view drivers approaching the intersection from the north and from the east would have of

traffic approaching from the east and from the north, respectively.

Mr. Cockrell, resident engineer for The State Highway Commission, testified:

That on the day of the collision after a "driver turned on that day on Loop 287 and drove from there to the intersection of 58 and Loop 287 and drove West (from Highway 69) there was not a single warning sign, stop sign, slow sign, speed sign, or any other sign of any kind;" nor was there a flagman of any kind between 69 and the intersection where the collision occurred. There were regular highway warning signs back on Highway 69 warning of construction, drive carefully, etc., but there were no warning signs of any kind on Loop 287 between Highway 69 and the intersection where the collision occurred. Likewise, there were no warning signs, stop signs, intersection warning signs, slow signs, flagmen, or any other similar signs North of Loop 287 on Highway 58 which would warn a motorist of the intersection or that his highway was crossing the loop under construction; that before the time of the Moore-Loving collision nobody with The Jarbet Company ever came to him and informed him that traffic was using 287 in any heavy volume; that no one with The Jarbet Company came to him and proposed a new plan for the handling of traffic safely and conveniently through the intersection and sought his approval for such new method of handling traffic. There were no stop signs at the intersection for either East-West traffic or North-South traffic on the day of the collision; nor were there any intersection marker signs of any kind near the intersection for North-South traffic or East-West traffic on the day of the collision; that a driver moving from the North (just as Mr. Moore was moving) approaching the intersection, looking to

his left trees and undergrowth obstructed his view of Highway 69 traffic moving towards the intersection.

Appellant Jarbet's ramrod or boss on the 287 job at the time of the collision was Mr. Earl Rocky, who testified:

He was the man in charge of the intersection in question and was the man responsible for it. He was, likewise, the man in charge of and responsible for the entire stretch of the loop from Highway 69 to the intersection where the collision occurred; as he was the man in charge of anything that The Jarbet Company had to do out there on the construction job. On the day of the collision, and prior thereto, he knew that Highway 58 was the only paved road that crossed his loop job between Highway 59 and 69; that at the time of the collision he had a road barricade across Highway 59, with a road closed sign on it, but he knew that traffic was going by that and using the loop. He did not have a flagman out there on the day in question because "I didn't have anybody to work it." On the day of the collision he didn't have any kind of warning at all out there other than the barricade that he says was supposed to have been out there to block traffic, though he did know the traffic was using the loop on the very day of the collision and he knew that traffic had used it on the day before; he knew that traffic was traveling on the loop and crossing Highway 58 where it intersects the loop, yet he did not station a flagman at the intersection. He admitted (1) there was no warning sign at all at the intersection (2) there was no slow sign at the intersection (3) there was no flagman at the intersection (4) there was no stop sign at the intersection (5) there was no kind of intersection marker at all at the intersection (6) there was no speed sign at the intersection; that he knew and realized that it was part of his contract and

responsibility to erect any warning signs necessary for the safety and convenience of the traveling public. He admitted that he didn't even know traffic was authorized to use the loop but that he knew traffic had been using the loop in increasing heavy quantities during the two or three weeks immediately preceding the collision; that he knew that Highway 58 was a heavily traveled road; that he was not even furnished with or concerned with any specification sheets or plans showing that signs should be erected by the contractor. He stated, "I hadn't done anything" about the traffic.

Referring to the number of each special issue, the jury's findings are summarized as follows:

1. The defendant Jarbet "failed to place a sign on Loop 287, prior to the date of the Moore-Loving collision, warning traffic on Loop 287 of its intersection with Highway 58."

1A. That failure was negligence.

1B. That negligence was a proximate cause.

2. Jarbet "failed to place a sign on Highway 58 prior to the date of the Moore-Loving collision, warning Highway 58 traffic of the intersection of Highway 58 with Loop 287."

2A. That failure was negligence.

2B. That negligence was a proximate cause.

3. Jarbet, prior to the Moore-Loving collision, "failed to warn Highway 58 traffic that Loop 287 was being used by westbound traffic."

3A. That failure was negligence.

3B. That negligence was a proximate cause.

4. Prior to the Moore-Loving collision, Jarbet "failed to warn Highway 58 traffic that Loop 287 traffic was not required to stop for the intersection."

4A. That failure was negligence.

4B. That negligence was a proximate cause.

5. Prior to the collision, Jarbet "failed to properly mark the intersection and its approaches with warning signs." "Properly mark the intersection" means a marking of the intersection as would have been made by a contractor of ordinary prudence in the exercise of ordinary care under the same or similar circumstances."

5A. That failure was a proximate cause.

6. Prior to the collision, Jarbet "failed to place stop signs at the intersection for either East-West or North-South traffic."

6A. That failure was negligence.

6B. That negligence was a proximate cause.

7. Prior to the collision, Jarbet "knowingly permitted traffic to travel on Loop 287 and through its intersection with Highway 58."

7A. Prior to the collision, Jarbet "knowingly permitted such traffic, if any, to move through the intersection with knowledge that no flagman, warning sign or stop signs were at the intersection for the benefit of the traveling public."

7B. That action was negligence.

7C. That negligence was a proximate cause.

8. On the date of the collision, the Jarbet ramrod or boss knew that traffic had become increasingly heavy on Loop 287 through the intersection for approximately three weeks prior to the date of the collision.

8A. After having such knowledge, "the Jarbet ramrod or boss failed to make a proper inspection of the intersection's safety for the traveling public prior to the date of the Moore-Loving collision." "Proper inspection" means such an inspection as would be made by a highway construction contractor in the exercise of ordinary care under the same or similar circumstances."

8B. Such failure was a proximate cause.

16. That at the time and on the occasion in question J. O. Moore did not fail to keep a proper lookout.

18. That J. O. Moore did not fail to timely apply his brakes.

21. That J. O. Moore was not driving his vehicle at a greater rate of speed than a person of ordinary care and prudence would have driven his vehicle under the same or similar circumstances.

23. That at the time and on the occasion in question Dorothy Loving did not enter the intersection in question before J. O. Moore entered the intersection.

27. That Dorothy Loving did not fail to yield the right of way to the vehicle driven by J. O. Moore.

31. That Dorothy Loving did not fail to keep a proper lookout.

34. That Dorothy Loving did not fail to timely apply her brakes.

38. That Dorothy Loving was not driving her vehicle at a greater rate of speed than a person of

ordinary care and prudence would have driven her vehicle under the same or similar circumstances.

■ Appellant Jarbet contends not only that it owed no duty to place signs or warning devices to warn of the intersection in question but for it to have done so would have been an unlawful and unauthorized act, citing City of Austin v. Schmedes, 154 Tex. 416, 279 S.W.2d 326, 52 A.L.R.2d 680 (1955). The above case involved an accident of December 9, 1952, before the Legislature of Texas in 1953 enacted Art. 6674u, Vernon's Ann.Rev.Civ.St.Tex. Adams v. Corbin, 301 S.W.2d 209 (Tex.Civ.App.1957) err. ref. n. r. e.; and Buckner & Sons v. Allen, 289 S.W.2d 387 (Tex.Civ.App.1956) err. ref. n. r. e., ably review Texas decisions and statutory law governing construction cases in which the State of Texas is a party. After the enactment in 1953 of Art. 6674u, such decisions held: "A contractor performing construction work on a public highway is under a duty to exercise ordinary care to protect travelers who are rightfully using the highway and is guilty of negligence in failing to give warnings of danger resulting in damage to the traveler." Paraphrasing the decision in Buckner & Sons v. Allen, supra, this court holds that under the contract, the statutory law and authoritative decisions, the appellant owed a duty to provide means by which the public could safely travel over the portion of the highway under construction. Necessarily, this means that travelers on Highway 58 should have been warned of its intersection with Loop 287. The contract and its performance created the state of things which furnished occasion for Mrs. Vinnie Moore's injuries and the death of J. O. Moore, for in the performance of the contract appellant was bound to use due care to avoid injuries to persons or property and was liable for its negligent acts of commission or omission when it knew or should have known of the dangers which resulted in such death and such injuries. It cannot be disputed that the work done under the contract rendered the highway dangerous for travel unless the proper warnings were given. Under the holding in Buckner & Sons v. Allen, supra, appellant Jarbet was authorized to erect or maintain signs, signals or devices directing the movement of traffic to provide means by which the public could safely travel over the portion of the highway under construction, including the intersection with Highway 58. Each and all of appellant's points of error contending that they owed no duty to place signs or warning devices or flagmen to warn of the intersection in question and that same would be an unlawful and unauthorized act on their part are each and all overruled. Continuous inspection of Loop 287 on the part of Jarbet as the work progressed and the public was traveling Loop 287 should have been made by it to the end that the safety of the traveling public would have been protected by adequate warnings of the hazards of the intersection in question.

■ Appellant has points of error as to the findings of the jury in answer to special issues Nos. 16, 18, 1a, 1b, 2a, 2b, 3a, 3b, 4a, 4b, 5, 5a, 6a, 6b, 7, 7a, 7b, 7c, 8, 8a and 8b separately urging as to each (a) there is no evidence to support each of such answers, (b) there is insufficient evidence to support each of such answers, and (c) each of such answers is against the overwhelming weight and preponderance of all the credible evidence in the case.

■ In considering the above "no evidence" points, that part of the record most favorable to appellees supporting the jury's findings is controlling and each point is overruled. In the "insufficient evidence" points and the points urging each finding as being against the overwhelming weight and preponderance of all the credible evidence in the cause, all the evidence is reviewed. Each and all of said "insufficient evidence" points are overruled. The findings of the jury are not so contrary to the overwhelming weight and preponderance of the evidence as to be manifestly unjust and, ac-

cordingly, each and all of such points are overruled.

Appellant's point of error urging that as a matter of law the said J. O. Moore failed to keep a proper lookout, proximately causing the collision in question is overruled. Appellant's point of error urging that as a matter of law the said J. O. Moore failed to timely apply the brakes on his vehicle and that such failure was negligence, proximately causing the collision in question is overruled.

Appellant contends that even assuming negligence in the various acts and omissions on the part of Jarbet found by the jury in special issues Nos. 1 through 8, both inclusive, that it was not foreseeable by The Jarbet Co. that the collision in question or some similar event would have occurred, and, therefore, judgment rendered based in part upon the jury's answer to each of special issues Nos. 1b, 2b, 3b, 4b, 5a, 6b, 7b, and 8b was erroneous. These contentions and appellant Jarbet's points of error thereon are overruled.

■ Appellant's 98th point of error is as follows:

"The trial court erred in permitting the witness, Dorothy Loving, over defendant's objection to testify that at the time and on the occasion in question neither she nor J. O. Moore was negligent, or did anything wrong bringing about the accident in question, the same being incompetent testimony, prejudicial to the defendant and calculated to and probably did bring about a jury verdict adverse to defendant."

Prior to this question Mrs. Loving testified:

"I don't think he was going any faster than I was and I don't think he saw me until I saw him (referring to Mr. Moore)."

Without any objection from appellant, this testimony of Mrs. Loving was introduced:

"Q All right. As far as you can tell from observing the pickup it made a normal drive and did not do anything out of the ordinary?

A No, sir. I don't think he saw me before I saw him and there was not a thing either one of us could do about it."

Appellant itself introduced this portion of Mrs. Loving's testimony:

"Q And you don't know whether Mr. Moore knew that the highway was traveled, do you?

A No, sir.

Q So you don't know whether he did anything wrong or not, do you?

A No, I don't know that he did anything wrong.

Q All you are telling us is that you don't think you did anything to cause the accident, is that right?

That's right. And I just don't think that Mr. Moore saw me either.

Q Of course, you don't have any way of knowing that, do you, you are just assuming that if he had seen you that he wouldn't have driven out there and hit you?

A That's an assumption, yes."

"Q You don't have any way of knowing whether he did or not, do you?

A No.

Q Why are you saying that you don't think he did, if you didn't observe him?

A Well, I just don't think that he would drive out there and hit me on purpose.

Q Well, of course, you are not accusing anybody of deliberately causing this accident, are you?

A Not as far as I know.

Q  You are just saying that Mr. Moore didn't deliberately come out there and hit you?

A  No.

Q  But you don't know whether he was looking off some other way or speeding or what, do you?

A  I wouldn't think that he was speeding.

Q  How do you know that?

A  Well, I don't think he was.

Q  Why don't you think he was?

A  Well, from, well, I just don't think that he was."

From the nature of the testimony complained of when considered with the other evidence of the same witness not objected to which was cumulative, appellant waived any error. No harm came to the appellant by the introduction of the evidence. The error complained of did not amount to such a denial of the rights of appellant as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case and the point of error is overruled. Rule 434, Texas Rules of Civil Procedure.

■ Parts of the deposition of Dorothy Loving were offered by appellees. Then parts of the same deposition were offered by appellant by way of *cross-examination*. Appellees then stated and objected to the latter as being cross-examination because appellant made Mrs. Loving its witness as to that portion of the deposition offered by appellant, which objection was sustained. Thereafter appellant offered for cross-action such portions of the deposition which were admitted by the court under its ruling. Regardless of whether appellant made Mrs. Loving its witness or not, as to the portions of her deposition offered by appellant, we

fail to see from examination of her testimony that any harm resulted to the appellant by such ruling of the court. The ruling of the court discussed did not amount to such a denial of the rights of appellant as was reasonably calculated to cause and probably did cause the rendition of an improper judgment, and appellant's 99th point of error is overruled.

■ Appellant contends that the trial court erred in recessing for lunch between the closing argument of appellant and the closing argument of appellees. Appellant has no bill of exception. The trial court did not abuse its discretion in recessing the jury for lunch. Such matters must be directed and controlled by the trial judge in the proper exercise of his discretion. Appellant's point of error thereon is without merit and is overruled.

■ Appellant contends that the trial court erred in submitting to the jury special issue No. 5 with the definition and explanation of "properly marked intersection" because it was a general submission containing several elements rather than a single fact issue and further because the issue was so vague and indefinite that it did not provide to the jury any guide line or standard by which to determine what would be an act of properly marking an intersection and its approaches with warning signs, thus permitting the jury to subject its deliberations to speculation and conjecture. Appellant made the same objections and exceptions to the court's main charge, which were carried forward in its motion for new trial. Special issues Nos. 1, 2, 3 and 4 inquired as to specific means of warning of danger appellant could have used. Actually, special issue No. 5 is more specific in many ways than the first four special issues. In Barclay v. C. C. Pitts Sand and Gravel Company, 387 S.W.2d 644 (S.Ct.1965) it was held that in an automobile case involving proper control, a general issue of proper control including, for example, excessive speed, failure to apply brakes, driving too

slowly, defective brakes, etc., is a broad issue which is adequate unless objected to. Further, that when all acts and omissions raised by the evidence which affect control of the vehicle are submitted the more general issue on proper control need not be given. When such a broad issue is submitted and objected to, then special issues relating to either primary or contributory negligence should be submitted to cover specific acts and omissions which have been raised by the evidence. Special issue No. 5 does inquire as to specific omissions raised by the pleadings and evidence not covered entirely by the other issues. In answer to other special issues the jury found Jarbet to have been negligent as to several specific acts of omission and commission. Excluding the jury finding in answer to special issue No. 5, Jarbet would be liable to appellees based upon such other jury findings. Therefore, appellant's point of error is overruled as not amounting to such a denial of the rights of appellant as was reasonably calculated to cause and probably did cause the rendition of an improper judgment.

Appellant further contends that the trial court erred in rendering judgment based in part on the jury's answer to special issue No. 8A because there was no duty incumbent upon appellant to make an inspection of the intersection safety except as to those items with which the construction was specifically concerned, it being undisputed that it was not construction, construction equipment, construction material or any operations of appellant that brought about or caused the collision in question. A similar point is directed to the submission of special issue No. 8B. The contract required that appellant make regular inspections. Under the contract this duty was owed by appellant to the traveling public. Appellant cites no authorities. Each and all of such points of error are overruled.

Each and all of appellant's points of error that have not heretofore been overruled are considered without merit and are overruled.

Judgment of the trial court affirmed.