BAILES, Judge.
This tort action was instituted by plaintiff, individually and as confirmed natural tutor of his minor children, to recover damages for the wrongful death of his wife and mother of the minor children. Named as defendants were the State of Louisiana, through the Department of Highways (Department), Moey Newsome, the Police Jury of St. Tammany Parish, the Parish Council of Jefferson Parish and the Greater New Orleans Expressway Commission. Also, certain third party pleadings were filed impleading other entities; however, in view of the subsequent action of the plaintiffs, we need not discuss that phase of the action.
The cause of action asserted in this suit arose from a two car collision between the vehicles of Marshall F. Badeaux and Moey Newsome. The collision occurred on September 1, 1956, at the intersection of the northern approach of the Greater New Orleans Expressway and U. S. Highway 190.
Mr. Badeaux, the driver of his own vehicle, died on the second day following the accident of injuries he received in the collision. Mrs. Lucille Guidry Pelloat, a passenger in the Badeaux automobile was killed, and Theodore C. Keyes, the other passenger in the Badeaux automobile, received injuries which have rendered his totally and permanently disabled.
Mrs. Lillian Davenport, widow of Marshall F. Badeaux, Sr., and Theodore C. Keyes have filed separate actions against the same defendants to recover damages sustained. Although consolidated for the purposes of trial in the lower court, and for hearing before this court, and while the reasons assigned for judgment in this case will control the disposition of the other consolidated cases, separate judgments will be rendered in each case.
No question is presented here of legislative authority, or the lack thereof, for the bringing of these consolidated suits.
*676 During trial on the merits in the district court, the plaintiffs dismissed their actions against all defendants, except the State of Louisiana and Moey Newsome. After trial, the district court rendered judgment in favor of all plaintiffs and against the State of Louisiana. No judgment, in any of the suits, has been rendered against Newsome. From this adverse judgment, the State of Louisiana has appealed in all cases. The plaintiffs answered the appeals, seeking an increase in quantum. We find the judgment must be reversed, and all claims asserted against the State of Louisiana dismissed at plaintiff’s cost.
Badeaux, Keyes and Mrs. Pelloat were employed by the Southeast Louisiana Hospital at Mandeville, Louisiana. On this tragic night, at about 10:45, these three persons were on their way to work. The Badeaux vehicle was traveling from west to east on Highway 190, and at the same time, Moey Newsome, accompanied by a passenger named Thelma Winston, was traveling north on the causeway approach road, or away from the causeway. The sole surviving occupant of the Badeaux vehicle, Mr. Keyes, because of brain injury and damage, was not mentally capable of testifying to any of the facts surrounding the collision. Both Newsome and Thelma Winston testified by deposition.
It appears that Highway 190 was a hard surfaced blacktop highway, the paved portion of which had a width of about 22 feet, and the right of way had a width of about 100 feet. The approach to the causeway was a four lane paved highway with two lanes each provided for northbound traffic and southbound traffic, separated by a neutral ground or median strip. The width of the right of way of this approach road was 200 feet. By designation of the Department, Highway 190 had the right of way over the approach road. From the photographs, maps and plats in the record, it appears that a stop sign was located on the right shoulder of the causeway approach and also one of the median strip which required all vehicles proceeding north (a like stop sign controlled traffic flowing south) into or across this intersection to stop before entering or crossing Highway 190.
The evidence unquestionably supports the fact that both Mr. Badeaux and Moey Newsome were quite familiar with the intersection, each having had almost daily experience with the crossing even though the causeway had been formally opened only two days before the accident. Further, both were long time residents of the area.- No unusual atmospheric conditions existed at this time; the roadway was dry and the weather was clear.
Both Newsome and his companion, Thelma Winston, testified that he, Newsome, stopped before entering, or attempting to cross, the intersection. He gave the following account of his actions just prior to the collision:
Deposition, page 25
“Q. * * * i say from the time you entered the highway proceeding toward this intersection, at what speed were you traveling?
A. I’d say between thirty and thirty-five miles an hour.
Q. And was that speed reduced in any way as you approached the intersection ?
A. Yes, I had to reduce it to stop.
Q. Did you stop suddenly or was it a jerky stop, or what.
A. I stopped just like you are supposed to.
Q. How long did you remain stopped?
A. Not long.
Q. Did you look in any direction other than forward before you proceeded?
A. I looked both directions.
Q. How far behind the actual intersection, that is, the beginning of the *677 line of Highway 190 that crosses the north approach, did you stop? Did you stop right there or a few feet behind, or what ?
A. Well, I couldn’t give no direct measurement. I stopped before I go to that highway.
% i{c ‡ ‡
Deposition, Page 101
Q. And how far behind the intersection where' the 'actual' highway portion of U. S. 190 goes would you estimate that was that you brought your car to a stop ?
A. I’d say it was a good little distance out of danger zone. I wouldn’t put no definite figure on it.
Q. Would it be ten feet, fifteen feet?
A. It could have been eight or ten feet.
* $ * ”
We find the record amply supports the finding of fact that Newsome stopped his vehicle before entering the intersection. He testified that he stopped about eight-or ten feet from the near lane of Highway 190. (“ * * * a good little distance out of danger zone * * * It could have been eight or ten feet.”) From our appreciation of the photographs identified as T. L. James 1 and 2 and Plaintiffs 1, 2 and 6, from the place where he stopped, Newsome had an unobstructed view of Highway 190 to his left from an unlimited distance, the left being the direction from which the Badeaux vehicle was approaching.
The trial court assigned the following reasons as the basis for finding that the Department was liable to plaintiff 7
« * * *
“The Highway people appraised the situation as of the present and the past giving no consideration to future needs and requirements, not even for expectancy of requirements extending one month into the future. A blind spot existed between the Highway authorities, employees, engineers, managers, etc. and the problems normal to expect as a result of the opening of the Expressway. To this extent they were deficient as well as negligent. The negligence of the Highway employees in failing to erect stop or warning signs on the West approach of 190 or State 22 to the Expressway and the absence of the warning signs of any nature was and is the proximate cause of the injury and damages suffered by the various and sundry plaintiffs as a result of the accident.”
The plaintiff, in his supplemental brief, has succinctly stated his case against the State when he said, “We are claiming that the State has negligently or improperly exercised the discretionary power vested in it in failing to mark a certain conjunction of roads. This negligence was, we claim, one of the proximate causes of very serious damages to the plaintiffs.”
In seeking to establish actionable negligence based on the alleged deficient signing of the intersection, the plaintiff called on cross-examination Mr. H. B. Norckauer and Mr. W. T. Taylor, traffic engineers of the Department, and Mr. David Dab-ney, the traffic engineer and vice president of Palmer & Baker Engineers, Inc., the engineering firm for the causeway construction, and also offered the expert testimony of Mr. Leslie Williams, a traffic engineer of Philadelphia, Pa. By stipulation between plaintiff and defendant, it was agreed that if he was called to testify, the testimony of Mr. Mel Conners, also a traffic engineer, would be the same as that of Mr. Leslie Williams.
Mr. Norckauer, a civil engineer working in the traffic control section of the Department, testified that he, along with Mr. Taylor, also of the Department’s traffic section, and Mr. Dabney, made an inspection of the intersection site for the purpose of signing the intersection in question dur *678 ing July, 1956. He stated that no traffic studies were made of this intersection prior to the date of the accident for the reason it was a new intersection and no count was possible; instead, the Department relied on their routine counts on Highway 190 to determine the traffic volume. He said that the expected rate of violations at an intersection is ten per cent; however, the counts at this particular intersection, subsequent to the accident, showed ninety per cent violations. He further testified that the Department anticipates the occurrence of several accidents right after a new road is opened.
It was his opinion, based on his knowledge of what had been done by the Department, that the Department has used accepted principles of traffic engineering in signing the intersection and in giving preference to Highway 190 over the approach road. The Department, he testified, considered the causeway approach to be a minor road and subordinate to Highway 190; therefore, the stop signs were installed on the approach road.
He further testified that there was adequate sight distance in all directions at the intersection, that is, a driver could see another vehicle approaching the intersection in sufficient time to stop or for the other vehicle to stop without difficulty. The record reflects that he testified that the signs existing at the time of the accident were thirty inch stop signs, and that these signs are larger than those usually installed, and this installation was in accordance with the Louisiana Manual on Uniform Traffic Controls. He stated that it was his opinion that there was no reason why a motorist could not see the stop signs. It was his opinion that the traffic controls and regulations were adequate and proper as of September 1, 1956. It was his opinion that the use of four-way stop signs is not recommended at any location and the volume of traffic anticipated did not warrant the installation of a traffic signal. While he testified to the occurrence of accidents prior to this one, he stated that the occurrence of accidents per se is not grounds for the installation of a traffic signal. He said that a cross road sign is only installed for a problem intersection and at this intersection the Department had a destination sign which was sufficient warning to the motorist traveling on Highway 190 of the approach of an intersection.
Mr. William T. Taylor, assistant traffic and planning engineer for the Department, testified that he made a survey of the intersection prior to the opening of the causeway. He stated that he made no special traffic count in this area but used the count made periodically throughout the state. He further stated that he made only a casual study of the sight distances, for the reason, that the important sight distance, where there is a stop sign, is the sight distance that a motorist has at the stop line. The sight distance at this particular intersection was not critical at this point, though it was some distance back from the intersection. The sight distance at this intersection was such that an approaching motorist could see the stop signs from Highway 190; that there was good sight distance at the sign so the causeway motorist could see any approaching traffic on Highway 190.
According to his testimony, the signing of this intersection complied with the applicable signing standards specified by the Louisiana Manual of Uniform Traffic Control Devices and with the standards of the Bureau of Public Roads and the American Association of State Highway Officials.
Mr. Taylor testified that the plans offered by Mr. Dabney showed a stop ahead sign and a stop sign, each placed on the left and right side of the roadway. He stated that the stop ahead sign was not warranted since it is only to be used when the stop sign is not clearly visible to approaching motorists but he said that it was installed as an additional sign. Further, the gate post signing, that is, the placing of a stop sign on each side of the highway, was an added safety feature.
*679 Further, he stated that the causeway was subordinated to Highway 190 because the highway had established traffic volume and an established pattern while the approach road was new with no appreciable traffic, and without any established pattern. His testimony, in the main, corroborated that of Mr. Norckauer.
Mr. Dabney testified that he recommended that Highway 190 be subordinated to the center prong of the north approach road because he thought" traffic would be heavier on this particular causeway approach and it was a larger road than Highway 190.
A particularly pertinent portion of his testimony is found on page 826 of the record, wherein he was questioned, as follows :
“Q. Now, in 1956, did you feel that the standard set forth in the sign manual were adequate for the purpose of making this intersection safe, or did you think that some original planning was warranted and called for?
A. I would have to answer that with a little bit of explanation. The intersection in 1956 prior to the time traffic was using the north approach was an unknown quantity. The anticipated volumes were estimated in the engineers report. We didn’t know exactly what the traffic volume would be in fact. (Following this he discusses traffic using the north approach coming from conditions of city traffic of New Orleans not pertinent herein) I didn’t see any great reason at that time to go into a super control of any type because the volumes were going to be relatively low for both those highways.”
Mr. Dabney also testified that he would not consider the use of flashing lights nor would he consider the use of jiggle bars or whisper strips on either Highway 190 or the causeway approach. As to signing Highway 190 for the intersection, he stated that the destination sign was adequate to give notice of the intersection.
Mr. Williams, plaintiff’s traffic expert, strongly condemned the traffic control measures employed by the Department of Highways. He stated that because of the sight distances involved for drivers on both Highway 190 and the causeway approach certain signs and devices would have to be employed to decrease the degree of hazard inherent in this situation; that an “effort should be made to warn a driver on U. S. 190 in an East bound direction that he was approaching an intersection and that effort should be made to have him reduce his speed in entering this intersection with inadequate sight distance and that a cross road sign should definitely be placed on U. S. 190 and with an advisory speed sign placed below the cross road sign. In addition, destination signs and if the causeway is a numbered route, then route markers also would be established. There should also be placed on 190 at the intersection a barrier line, for example, no passing, to warn the motorist that he is approaching an intersection, and also, in my opinion, under the circumstances, a stop" sign should be erected at the intersection.”
He further testified that there existed sufficient warrant for a “stop” sign on Highway 190, for the subordination of Highway 190 to the causeway road, for a traffic light directed at vehicles on Highway 190, for a flashing light on the causeway directed at causeway traffic, for the erection of crossroad signs on Highway 190, for the placing of yellow median stripes on Highway 190 to indicate to a driver that there should be no overtaking at this intersection, for the erection of an actuated speed control signal, and that it would have been proper to install jiggle bars or whisper strips to slow down traffic on Highway 190.
From our appreciation of the available traffic signal devices, Mr. Williams, accord *680 ing to his testimony, advocated the use of the above recited devices for the control and regulation of this intersectional traffic, and that if these were employed, in his opinion, the intersection would not be over-signed. It was admitted into evidence by his testimony that, in his opinion, this accident was the result of the insufficiency of the signing of Highway 190 and the placement of the stop sign SO feet south of the intersection facing northbound traffic, and the lack of any and all of the available signs which would notify the motorist on Highway 190 of the approach to the intersection.
It was further his opinion that Newsome was justified in assuming that the two-lane highway would be governed by stop signs as was the four-lane highway. He stated that the hazard which caused this accident would have been foreseen by traffic engineers if they had made the proper studies. Furthermore, he concluded that the highway department led Badeaux into danger by not making the traffic on Highway 190 decrease its speed or come to a stop and by not providing greater sight distance to enable him to drive defensively.
Our careful review of the testimony of all the experts leads us to the conclusion that the testimony of Mr. Williams, even bolstered by the stipulated testimony of Mr. Conners, is insufficient to establish by a reasonable preponderance of the evidence that with legal certainty the Department was guilty of actionable negligence, or that, if the Department were negliegent in signing this intersection, such negligence was a proximate cause of the accident. Our perusal of the record convinces us that the testimony of Messrs. Norckauer, Taylor and Dabney, although Mr. Dabney disagrees on the question of preference of Highway 190 over the causeway, is entitled to more weight than that of Mr. Williams. The traffic experts, Messrs. Norckauer, Taylor and Dabney were in agreement that if Highway 190 was to be given the right of way over the causeway approach, the signing of the intersection was adequate and in keeping with the facts of traffic count and estimates available at the time of the opening of the intersection. It must be remembered that there were three outlets and inlets for traffic to and from the causeway.
We find that Mr. Williams’ consideration of and conclusion that Newsome’s sight distance was limited is not valid nor controlling because Newsome testified that he was from eight to ten feet from the path of Highway 190 through the intersection (we believe that is what he was describing as the danger zone, in his testimony), whereas Mr. Williams had placed him some forty feet further to the south when he stopped and looked to his left. Mr. Williams’ conclusions were further based on an invalid assumption that Mr. Badeaux had no notice of the intersection. The destination sign on Highway 190 was notice to Mr. Badeaux that the intersection was there. This factor, coupled with the additional prominent fact that Mr. Badeaux was fully aware and completely familiar with this section of the highway and environs, further points up the fact that Mr. Badeaux was aware of his approach to this intersection.
The plaintiff must sustain the burden of proving a proximate causal connection between his damages and the alleged negligence of the defendant. It does not suffice for the plaintiff to make out a case which is merely probable; he must establish his claim to a legal certainty by a reasonable preponderance of the evidence. Lambert v. State Farm Mutual Automobile Insurance Co. (La.App.1966) 184 So.2d 107; Duhon v. Cormier (La.App.1966) 186 So.2d 645, 646; Martin v. Westchester Fire Insurance Company (La.App.1966) 183 So.2d 769; Gassiott v. Gordey (La.App. 1966) 182 So.2d 170; and Hayward v. Carraway (La.App.1965) 180 So.2d 758.
Plaintiff, supported by the witnesses, Williams and Conners, takes the position that it was grave error to subordinate the approach road to Highway 190 because of *681 the grandeur and size of the approach road over that of the ordinary two-lane U. S. Highway 190. These two witnesses heaped criticism on the Department traffic engineers because of this decision, and the lack of a stop sign on Highway 190. In retrospect, this conclusion may be correct; however, the Department engineers assigned what appears to us to be cogent reasons for their decision.
The following testimony of Mr. Taylor, we believe, supports this conclusion:
Record, Page 757
“Q. And you recall that it was your decisión do you not to subordinate the causeway approach to 190?
A. Yes.
Q. Why?
A. There were a number of reasons for that. First, we had a U. S. Highway marked as such with an established traffic volume and an established pattern. Quite a number of the people that traveled this U. S. Highway travel it in each state, and people become habit conscious. They just drive and if you suddenly change a control device in front of them, you find very often they will run this device without ever realizing its changed. We have that as fact. We were opening a new highway and on it was a four lane highway. There was no appreciable traffic on it. It wasn’t opened to traffic, and therefore this was going to be a new traffic and that traffic as such did not have an established pattern. We thought we probably. could control that traffic better; and I’m giving you nly reasons now, than we could control this traffic that already existed. The speed limit in the state of Louisiana at that time was 60 miles an hour on the highway, so we had no difference in the approach speed, as we were going to have 60 miles an hour approach speed on each. As far as I can remember the traffic volumes on U. S. 190 was in the neighborhood of 18- 1900 vehicles a day. I think that’s the figure. Again I’m going from memory. The estimate for the causeway, well our estimate of the causeway was somewhere in that vicinity also and we had three places that that traffic could leave the causeway, so we. really, or I felt that the traffic volumes approaching the side road would not be any greater than that which existed on the U. S. Highway. Then on the approach of the new highway it was tangent. It was wide opened. From the placement of signs we felt that the people could see them and be able to stop. For those reasons we decided to stop the causeway approaches.”
The plaintiff argues that “the traffic design with reference to the signing of the subject intersection was improperly conceived thereby creating the foreseeably dangerous situation: A. If Moey New-some stopped and looked; B. If Moey Newsome didn’t.”
Plaintiff states his position as this, with reference to the creation of a foreseeably dangerous situation. He argues that because the causeway approach has a right of way of 200 feet and Highway 190 has a cleared right of way of 100 feet with no warning devices on Highway 190, the State was “beckoning traffic into what was reasonably foreseeable as a trap from which the unsuspecting motorist was unable to extricate himself once the jaws of the said trap was sprung.” This argument does not reckon with the facts of the case and the testimony of the Department’s engineers. Highway 190 traffic was notified, in advance, that in the approach there was an intersection.
In applying the facts to the law, plaintiff states that assuming Moey New- *682 some stopped and looked from a position in advance of the stop sign where he says he stopped, it would have been impossible for Newsome to have cleared the intersection in time to have avoided contact with the Badeaux vehicle. We cannot agree with this statement of fact. Not only is this statement and conclusion of plaintiff not a correct statement of a physical fact, the argument is unsound for the reason that Newsome had the positive duty not to enter this intersection in the face of an oncoming vehicle. As we have noted supra, from the position on the approach road where New-some testified he stopped he had an unlimited sight distance to the west, or his left. No action or inaction of the Department traffic engineers relieved Newsome of the legal duty not to proceed into that intersection until it could be done with safety.
Plaintiff further states in his brief, with reference to granting Highway 190 right of way over the approach road and failure to notify a motorist on Highway 190 that he was approaching an intersection, that a Mr. Champagne, a member of the Police Jury of St. Tammany Parish and also a member of the Greater New Orleans Expressway Commission, thought such notice to motorists should be given and “that’s why he raised the devil with the State of Louisiana Highway Department about it before this accident happened.”
The only reference we find in this record to any “devil raising” by Mr. Champagne is a motion recorded in the minutes of the meeting of the Greater New Orleans Expressway Commission on August 29, 1956, wherein it was agreed that the commission would discuss with the Department the installation of a signal light at this intersection.
If the signing of the highways is a science, and the proper or improper signing of the highways is determined on a scientific basis, and we must assume that it is because the Department has a particular section devoted to such work which makes studies and surveys of traffic conditions at various places throughout the system, and the plaintiff has offered expert testimony bearing on traffic signing, then certainly the Department cannot be convicted of committing a negligent act or omission simply because perchance some one or some organization or some civic club, howsoever well intended, guessed that certain controls should be installed. Our appreciation of the science of highway signing does not include the clamor of untrained individuals for the installation of some particular signal device at some particular location. Granted, occasionally the lay opinion may be correct, our highways are not signed, or the traffic thereof controlled, in this manner.
The other facet of the plaintiff’s argument is that “Moey Newsome being where he should not have been at the moment of impact was a concurrent intervening cause of the collision which should have been foreseen by the State of Louisiana through the Department of Highways.” Plaintiff states that the testimony of Mr. Williams shows that a larger and more generally conspicuous signal device should have been used at the intersection in order to warn the public of exactly where the intersection was, and also that his testL mony shows the inadequacy of the sight distance. Our finding of fact as to the point where Newsome stopped is not in accord with the assumption of Mr. Williams as to where he stopped. Additionally, Mr. Williams’ contrary opinion notwithstanding, no matter how many signal lights, stop signs or other signaling devices which might have been installed at this intersection on the occasion of this accident, would not have prevented Newsome from moving into the intersection from his stopped position.
None of the many cases from the courts of this state cited by plaintiff are applicable, controlling or persuasive of the legal question before us herein which is a determination of negligence vel non of the Department. ' We could perhaps see some merit to plaintiff’s argument if this were a case *683 in which there was no discretion whatever in the action of signing, or if there had been no signing whatever of the intersection. This is not the case before us. There is a sound discretion vested in the Department; it is a matter of judgment as to what is or is not required to accomplish the adequate signing.
As we view and appreciate the matter of signing highways, and this section in particular, it is not an exact science. The engineers of the Department were faced with the task of signing this intersection (almost ten years prior to the trial of the case on the merits), the engineers made an inspection of the area, were confronted with certain unknown traffic conditions and flow, and made a determination of what they, in the light of their knowledge, expert training and experience, considered was adequate to properly handle the flow of traffic. We find the Department engineers exercised their best judgment based on their earnest appreciation of the problem. We find no abuse of discretion.
We are constrained to mention that we are influenced nor persuaded by the testimony of Mr. Williams and Mr. Conners that they found the Department guilty of negligence which caused this accident and resulting damage to plaintiff. The admission of this kind and type of testimony into the record is in no wise proper. It is the province of the court alone to determine negligence.
Assuming arguendo that the Department breached a duty it owed to the traveling public, it must be remembered that the mere breach of a duty or the commission of an act of negligence does not alone render a party liable for damages resulting from such act. It is well established and settled beyond any question that such negligence must be the sole proximate or a proximate cause or a contributing proximate cause of the accident for the party guilty of the breach of duty or the negligent act to be liable for the resulting damages. See Muse v. W. H. Patterson & Company (La. App.1965) 182 So.2d 665, and the cases cited thereon. We find no actionable negligence on the part of the defendant.
In his brief, plaintiff states, “After a thorough search of the law applicable to the facts of this case, we have been unable to find any similar cases exactly in point in Louisiana Jurisprudence. We have, however, been successful in locating the cases of Eastman v. State (1951) 303 N.Y. 691, 103 N.E.2d 56; Robinson v. State of New York (1962) [38 Misc.2d 229] 237 N.Y.[S.]2d 601; and Hicks, et al v. State of New York (1956) [3 A.D.2d 106] 159 N.Y.[S.]2d 1. * * *.”
The case of Eastman v. State, supra, is not apropos for the reason the intersection at which the accident occurred and which gave rise to the action was an uncontrolled intersection. The alleged dangerous condition, on which the court attached liability, was the absence of a stop sign to halt traffic. It appears in that case there was at one time a stop sign, but it had previously been removed and at the time of the accident there was no stop sign whatever and a total absence of any signing by the defendant.
In Robinson v. State of New York, supra, the State of New York had no stop sign or other traffic control sign, signal or device at an intersection. Therein the court stated “that the State’s negligence (in not installing a stop sign) was a contributing cause because Mrs. Rollier (driver of the car which would have been required to stop by such a stop sign) who was operating her automobile on the Outlet Road entering the intersection would have been required to stop her vehicle and yield to traffic on the state highway had there been any warning or directive sign prescribing such conduct on her part. Absent such a regulatory sign this operator could properly feel that she had a right to attempt to enter this intersection even if she saw a vehicle approaching from her left. If the Robinson car was farther away from the intersec *684 tion than she was, Mrs. Rollier had just as much right to expect the Robinson car would yield the right of way to her inasmuch as she was entering the intersection from the right. The absence of any traffic control from Outlet Road was certainly one of the causes of this accident.”
The court in the Robinson case went on to state, referring to a previous case in which a contrary result was reached, that:
“Applebee v. State, supra [(1955) 308 N.Y. 502, 127 N.E.2d 289] although reaching a different conclusion in finding in favor of the State, supports the conclusion we have reached as to the State’s negligence. There the evidence was clear that the vehicle entering the main highway came to a complete stop. The absence of a ‘Stop’ sign was therefore immaterial. The operator there knew that she had to come to a stop and did so. Here, we find as a fact, that the Rollier car did not come to a stop; had the ‘Stop’ sign been there she presumably would have obeyed the direction and yielded to traffic moving on Rouge 50.”
Both the Robinson and the Applebee cases support our conclusion that the sole proximate cause of this accident was the negligence of Newsome in not yielding the right of way to the Badeaux vehicle.
In Hicks v. State of New York, supra, the court found no liability on the State for failure to erect a stop sign, thus, in the main, the cited case is not apropos. Also plaintiff cites Lucas et al. v. Phillips et al. (1949) 34 Wash.2d 591, 209 P.2d 279, in support of his contention. This cited case involves the absence of proper signs warning motorists of the presence of a narrow bridge. It is not analogous to the question before us. Finally, plaintiff cited the case of Jarbet Company, Inc. v. Vinnie Moore et al. (Tex.Civ.App.1965) 397 S.W.2d 268. The holding of the court in this cited case is based on a statement of facts wholly unrelated and entirely different from those of the instant case.
It is our conclusion that the sole proximate cause of this accident was the negligence of Moey Newsome in not keeping a proper lookout and in proceeding across the intersection in the face of the oncoming Badeaux vehicle and without taking the proper precaution of determining that the highway was free of traffic the movement of which would be involved in his entering the intersection. Further, we conclude that there is no causal relationship between the absence of additional warning signs of the intersection on Highway 190 and the collision between the vehicles of Newsome and Badeaux.
For the foregoing reasons, the judgment of the trial court in favor of the plaintiff is reversed, and there is judgment herein in favor of the State of Louisiana, through the Department of Highways, rejecting the plaintiff’s demands and dismissing his suits, at his cost.
Reversed.