246 So.2d 46 (1971)
Prior A. McCALLUM and Marie Belle McCallum, Plaintiffs-Appellees,
v.
STATE of Louisiana, Through the DEPARTMENT OF HIGHWAYS, Defendant-Appellant.
No. 3358.
Court of Appeal of Louisiana, Third Circuit.
March 10, 1971.
Rehearing Denied April 12, 1971.
*47 Robert L. Roshto, Baton Rouge, for defendant-appellant.
Sledge & Garroway by L. D. Sledge, Baton Rouge, LaBorde & St. Romain by P. J. LaBorde, Jr., Harold J. Brouillette, Marksville, for plaintiffs-appellees.
Before FRUGE, MILLER and DOMENGEAUX, JJ.
MILLER, Judge.
Plaintiffs Mr. and Mrs. Prior A. McCallum were awarded damages for injuries sustained in a one car accident caused by the State's failure to erect and maintain adequate warning signals on the approach to and at the site of a dangerous "T" intersection. Defendant, the Department of Highways appealed contending that the signs were adequate and alternatively that plaintiffs were contributorily negligent. Plaintiffs answered the appeal seeking an increase in the awards. We affirm.
At about 12:30 A.M. on March 16, 1968, Mrs. McCallum was driving their 1965 Ford on Louisiana Highway 1 in an easterly direction and was nearing the western limits of Simmesport. Her husband was asleep in the right front seat. Louisiana 1 came to an abrupt end at a "T" intersection just west of Simmesport. Traffic was to make an abrupt 90 degree left turn at this "T" intersection to proceed through Simmesport and continue on Louisiana 1. Traffic which did not make the turn continued into an open plowed field which was about 12 to 18 inches lower than the surface of the highway.
About 20 miles of newly located and constructed Highway 1 had been opened since late 1964 covering the distance from Mansura to the "T" intersection. The new road was designed to modern standards. It was generally straight and level; curves were gentle and gradual; it bypassed small towns, insuring continued and a generally unimpeded flow of traffic. Its traffic lanes were twelve feet wide, its surface of bituminous construction. The shoulders are hard surfaced on either side to a width of an additional nine feet. The posted speed limit is 60 miles per hour.
This was Mrs. McCallum's first time to drive on this road, but she had ridden as a passenger some five or six times over a two year period. She was aware of the fact that the abrupt end of La. 1 was marked with a big arrow at the end of the east bound lane. But this sign had been knocked down or "cleared out" by another vehicle which crashed through the marker on the night of March 14, 1968.
As eastbound traffic approached the abrupt end of the improved highway, there was a slight curve toward the right for the last 1700 feet. Mrs. McCallum was driving 60 mph and failed to see the posted warning signs to her right. She "caught a glimpse" of the stop sign as she reached the abrupt end. She attempted to apply brakes too late and fell into the plowed field. She and her husband were thrown from the car.
Photographs and plats in evidence show that before this accident, the intersection itself was signed with a group of signs at the head of the "T" intersection. When the eastbound motorist would drive in his proper lane at a point about 200 feet from the intersection, he would see the signs depicted in Exhibit P-17 at Tr. 400. The following sketch is a tracing from that photograph which was taken with a 35 mm camera using a 50 mm lense. This camera and lense (and therefore the sketch) produce a normal perspective.
*48 
P-17 shows the STOP sign and KEEP RIGHT sign located 67 feet and 191 feet respectively from the centerline of intersecting Oak Street. Other signs not shown in Exhibit P-17 (because the signs were west of and therefore behind the camera), are shown below the sketch of P-17. All signs south of the road were approximately 25 feet south of the centerline of La. 1. The distance to the centerline of Oak Street (which is at the top of the "T") is set forth by the reproduction of each sign.
Two nights before this accident, another motorist had driven through the intersection and knocked down the DEAD END, ARROW, and LA. 1 signs together with one or more of the vertical black and white striped signs, sometimes called delineators, hazard markers or culvert markers. The trial court held that all signs at the head of the "T" had been knocked down, but plaintiffs failed to prove this fact. The evidence preponderates that at least one and possibly two delineators were standing when Mrs. McCallum drove through the intersection.
The trial court held that where there had been more than fifty accidents at this intersection during the 42 months this road had been opened before plaintiff's March 16, 1968 accident; that most of these accidents were at night and were similar to plaintiffs' accident. Defendant vigorously contends that this finding is manifestly wrong. Their cross examination of the State Troopers, wrecker operators and local officials effectively pointed out that these witnesses did not have records to back up their testimony. The trial court was impressed with these witnesses. His finding of credibility will not be overturned.
It was well established that this was the most dangerous intersection in Avoyelles *49 Parish. The Highway Department superintendent admitted that they could not understand why there were so many accidents at the intersection, despite the maintenance of what the engineers had prescribed as adequate warning signs. Tr. 1241, 1245. He had discussed accidents at this intersection with the Baton Rouge office a couple of times. Tr. 1242, 1262.
The highway department either did not maintain records or if they did, they failed to produce records showing how many times they had to recondition or erect these signs at the top of the "T". They did know that there were a number of accidents at this intersection, but denied knowing there were so many.
It did not appear that the Department of Highways had checked this approach and intersection at night. The Department maintained that signing that was adequate for daytime driving was also adequate for nighttime drivingthe only qualification being that the signs had to be reflectorized. All Louisiana Highway signs are reflectorized.
Defendant's expert Traffic Engineer was of the opinion that a study should be made when there were six accidents in a twelve month period. Tr. 1279. Plaintiffs' expert would have a study made when there were two accidents in a twelve month period. Under either standard this intersection should have been the subject of a study. No study was undertaken.
Plaintiffs' expert explained that the intersection was properly signed for daytime travel, but not for nighttime travel. A former State trooper made the same statement. Tr. 638. Plaintiffs' expert would have required a wooden reflectorized barricade located at the head of the "T" such that it would appear to block La. 1's eastbound lane of travel. If that did not stop the rash of accidents, a blinking light or arrow would be required.
The trial court found that the slight turn in the road explained some of the trouble; that because of the turn the headlights would shine to the left side of the road and would not effectively reflect on the warning signs to the right. This conclusion was negated by defendant's expert.
The night pictures P-18, P-19 and P-20 are most difficult to interpret. It was established that the photographer used Kodak Plus X film in a 35 mm Nikon camera with a 50 mm f 1.2 Nikkor lense. But he was not asked to state the shutter speed and f opening used for the pictures. We can surmise that the pictures were exposed using time exposures, because the photographer related that the night pictures were made with the car stopped and the motor off. Tr. 533. These night pictures show the signs to the right, but the light reflected by these signs is faint when compared to the light reflected by the solid white line delineating the right edge of the highway, and the broken white line delineating the centerline. Even more important to understanding the problem of the night motorist is the fact that these picures show brilliantly lighted commercial signs which appear to be in the center of Mrs. McCallum's lane of traffic, but which are on the left side of the road. The intensity of the white highway lines and these other signs unquestionably detract from the effectiveness of the prewarning signs.
As plaintiffs approached, the only signs at the head of the "T" were one or two delineators placed to the side of the eastbound lane. The area beyond the top of the "T" was open field with nothing to reflect or warn of the hazard facing the motorist. The delineators at the top of the "T" did not simulate a barricade. The delineators were not properly used for they usually indicate hazards which the motorist can avoid by driving on the highway. Expert testimony indicated that the delineators created the illusion of a continuing highway; that they created an optical inducement to travel through the intersection. The opinion was well supported.
The signing at the top of the "T" was essential to the safety of this dangerous intersection. *50 The high number of nighttime accidents where the motorist drove through the top of the "T" required additional signing at the top of the "T".
The trial court held that the large number of accidents justified installation of the blinking light which had been requested by Mayor Earhardt of Simmesport.
The finding that defendant was negligent in failing to properly barricade and sign this admittedly dangerous "T" intersection is supported by the evidence.
In opposition, defendant contends that the authority to supervise and regulate all traffic on public highways was delegated by the Legislature to the Department of Highways as an exercise of its police power. LSA-R.S. 32:2. The Department therefore has the discretionary privilege to regulate traffic by placing such warning signs, signals and barricades or other traffic control devices as are desirable in its judgment, and plaintiffs have failed to establish an abuse of discretion. Pelloat v. State, Through Department of Highways, 198 So.2d 674 (La. App. 1 Cir. 1967).
Defendant contends that this case cannot be distinguished from DeGregory v. State Through Department of Highways, 192 So.2d 834 (La.App. 1 Cir. 1966) and Abboud v. Hartford Accident and Indemnity Co., 157 So.2d 338 (La.App. 3d Cir. 1963) where a standard STOP sign was held to be sufficient warning.
We distinguish the DeGregory and Abboud cases. In DeGregory plaintiff was found to be speeding under foggy conditions. In Abboud, plaintiff had driven through the same intersection earlier in the evening. These factors are not present here. In those cases, it was not established that there were a substantial number of similar accidents over a relatively short time.
The Department of Highways has the duty of maintaining the highways in a safe condition. This includes the duty of providing proper safeguards or adequate warnings of dangerous condition in the highway. LSA-R.S. 32:2. Rosier v. State, 50 So.2d 31 (La.App. 2d Cir. 1951). What constitutes proper safeguards and adequate warnings to motorists varies with the dangers presented and should be of such a nature that it is commensurate with the danger. Christ v. State Through Department of Highways, 161 So.2d 322 (La. App. 3d Cir. 1964). The negligence of the Department of Highways may be predicated on its knowledge or information of the existence of a dangerous or defective condition of the highway and subsequent failure to safeguard such condition. Reeves v. State, 80 So.2d 206 (La.App. 2d Cir. 1955).
Defendant knew or should have known about the frequent nighttime accidents caused by motorists running through the intersection. Defendant should have studied the problem of the nighttime motorist as he approached the admittedly dangerous intersection. This was not done. A study would have revealed that a reflectorized wooden barricade blocking the eastbound lane was necessary. If the accidents continued, a blinking red light or flashing arrow at the top of the "T", would have been indicated.
Having found that the prewarning signs were not effectively reflected because of the unusual conditions at the approach to this intersection, defendant's plea of contributory negligence is without merit. Defendant cites Weinberg v. State Through Department of Highways, 220 So.2d 587 (La.App. 2 Cir. 1969). There the motorist crashed through an erected barricade. In Weinberg there is no suggestion that the road curved or that other brilliantly lighted signs appeared to be in the center of the road and rendered the prewarning signs ineffective. There was no showing in Weinberg that there were some 50 similar accidents over a 42 month period.
It was established that on the morning of March 15, 1968, Mayor Leo Earhardt *51 of Simmesport inspected the intersection after it had been reported to him that there had been another accident at the intersection. At the top of the "T" he found that all except possibly one or two delineator signs had been knocked down. At 10 A.M. that morning he called the District Engineer on another matter and also reported the signs at the top of the "T" had been knocked down again. He had called on at least five other occasions when these signs had been knocked down. He asked for better signs, and mentioned that maybe they ought to put up "rubber signs". Mayor Earhardt testified that he was jokingly told that maybe they should put bales of hay in the field.
Mrs. McCallum was the victim of a hazardous trap as defined in Loubat v. City of New Orleans, 185 So.2d 87, 88 (La.App. 4th Cir. 1966). The prewarning signs were rendered ineffective because of the curve in the road and the lighting of commercial establishments and their signs which were on the left side of the road but appeared to be in the center of the road. As the motorist reached the abrupt end of the improved highway, she saw one or two delineators off to the side which created the illusion and the optical inducement of an open highway past the intersection rather than the harsh reality of certain disaster. Specific notice of the trap was received by the Department some 15 hours before the accident.
Defendant contends that the $40,000 award to Mrs. McCallum is excessive. Mrs. McCallum answered the appeal seeking $80,000 for her pain, suffering and permanent disability.
Mrs. McCallum had massive fractures of the pelvic cage, a broken nose, and displacement and disruption of the sacroiliac. She also sustained a burn on her arm and contusions of the bladder.
She was given glucose and a blood transfusion. Holes were drilled through both legs above each knee and pins (slightly smaller than one's little finger) were inserted for use in the traction treatment. She was hospitalized and in traction for seven weeks with cables attached to the pins. After traction she was placed in a "Hip Spica Cast" which encircled her body from chest over abdomen and covered each thigh. She was returned to her home but was totally immobilized for an additional six weeks.
The problems brought on by the cast were effectively detailed in the testimony. When the cast was removed she spent a week at Oschners in New Orleans taking physical therapy and learning how to walk with crutches. She spent three additional weeks in bed and six months on two crutches, then some time on one crutch. At the June, 1970 trial she still had muscle spasm. There was a nonunion at one of the fracture sites. She was unable to lift her legs high enough to mount stairs. She walked with a "waddle" and a limp. Squatting, stretching, stooping, bending were completely prohibited, and she could not stand or sit for extended periods of time without pain. Marital relations were painful but not impossible.
Pain prohibited the more arduous household chores. She could no longer ride in a boat to go fishing. Her dancing and flower gardening which she formerly enjoyed are now severely restricted. She has some traumatic arthritis, and this might become a more serious problem. She has a shortening of the right leg due to the misalignment of the right side. The nonunion is a permanent condition.
Plaintiff has a life expectancy of 27.4 years from the date of the accident according to Life Tables from Vital Statistics of the United States 1967, Vol. II, Section 5. Her hospital and medical bills totaled $3,153.80.
Mr. McCallum also answered the appeal seeking an increase in the $500 awarded for his pain and suffering. It is urged that his award should be increased "to compensate him for his past and future years of mental anguish and inconvenience *52 caused by his wife's injuries, and the multitude of related problems caused thereby, over and above the small sum he was awarded for his own personal injuries."
The awards are conservative. Brignac v. Pan American Petroleum Corporation, 224 So.2d 84 (La.App. 3d Cir. 1969). However there is no abuse of discretion in the trial judge's award. Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967).
The State, Department of Highways, is not assessable with costs other than stenographers' fees for the taking of testimony. LSA-R.S. 13:4521.
The judgment is amended by assessing cost to defendant with respect only to stenographers' fees. As thus amended, it is affirmed. The State is relieved from paying the cost of this appeal.
Amended and affirmed.