355 So.2d 52 (1978)
Barbara Ann BARR, Plaintiff-Appellee,
v.
STATE of Louisiana, Through the LOUSIANA DEPARTMENT OF HIGWAYS, Defendant-Appellant.
No. 13433.
Court of Appeal of Louisiana, Second Circuit.
January 16, 1978.
Rehearing Denied March 1, 1978.
Writs Refused March 17, 1978.
*53 Philip K. Jones, Marshall W. Wroten, Robert J. Jones, Doran & Kivett by William J. Doran, Jr., Baton Rouge, for defendantappellant.
Barham, Adkins & Coleman by Charles C. Barham, Ruston, for Barbara Ann Barr, plaintiff-appellee.
Gist, Methvin & Trimble by Alonzo P. Wilson, Alexandria, for Paul D. Spurlock, third-party defendant-appellee.
Hayes, Harkey, Smith & Casio by Thomas M. Hayes, Jr., Monroe, for Travelers Insurance Co., intervenor.
Before PRICE, HALL and JONES, J J.
En Banc. Rehearing Denied March 1, 1978.
JONES, Judge.
Defendant appeals from a judgment[1] awarding damages to the surviving wife and children for the death of Bobby Ambrose in a two-truck collision allegedly caused by the negligent construction and maintenance of a bridge and its approaches on Louisiana Highway 145 in Jackson Parish, Louisiana. The judgment also denied defendant's third-party demand against Paul Spurlock, driver of one of the vehicles involved in the collision.
We modify the judgment by awarding judgment in favor of defendant on its third-party demand against Paul Spurlock for a contribution of one-half the amount of the judgment against the State of Louisiana, Department of Highways, and as thus modified, we affirm.
The accident occurred at 6:45 a. m. on July 31, 1973, approximately 65 feet north of a narrow bridge on Highway 145. This two-lane blacktop road runs generally north and south and the surface is from 20 to 21 feet wide and narrows to about 19 feet as it approaches the bridge, which was 18 feet eight inches wide. The bridge, 59 feet long and straight, was constructed in the arc of a curve. Hills sloped downward on the north and south approach. Because of a hill and curve at each end of the bridge, drivers are required to get within 300 feet of the bridge before they could observe vehicles coming from the opposite direction. There is a curve sign with a recommended 40 miles per hour speed designation on the north and south approach. There were no other highway signs in the area.
The decedent was driving a truck and trailer unit 8.67 feet wide. Third-party defendant Paul Spurlock was driving a school bus converted to a poultry vehicle which was 7.92 feet wide. The combined width of the bus and truck is 16.59 feet. The width of the bridge is 18.7 feet. While it is possible for the two vehicles to pass on the bridge at the same time, the highway experts who testified for plaintiff established that because of the misalignment of the straight bridge in the arc of the curve, it is impossible for a driver approaching the bridge to make a straight entry upon the bridge. He will enter the bridge much closer to the center line and he drives away from the outside edge of the bridge to his left very close to and sometimes over the center line. These experts further testified that due to the misalignment of the bridge, the trailer being towed by Ambrose's truck would offtrack and travel as much as a foot further to the left than the truck towing it. Under these circumstances, it would be virtually impossible for the trucks to pass each other on the bridge at their respective speeds of 35-40 miles per hour without colliding. One of the experts testified that in order for the two vehicles to safely pass on the bridge they would have to be operated by stunt drivers.
As Spurlock, driving south, reached a point 200 to 300 feet north of the bridge, he observed Ambrose driving north at a point *54 between 75 to 100 feet south of the bridge. Knowing the two vehicles could not safely pass on the bridge, Spurlock applied his brakes. When he applied his brakes, the rear of the bus veered into the northbound lane and after skidding 140 feet, collided with the northbound Ambrose vehicle. The Ambrose vehicle struck the left side of the bus approximately five feet from the back of the bus and following the collision went off the road on the right side. The point of impact was entirely in Ambrose's lane of travel. Ambrose was killed in the collision.
Ambrose was not familiar with the scene of the accident and was unaware of the narrowness of the bridge. Spurlock had crossed the bridge approximately two times a week for several years and knew it was impossible for the two vehicles to safely cross the bridge at the same time.
The bridge was built in 1928 and was part of a gravel or dirt road. At the time the bridge was built, the road was not as wide, vehicles were not as wide, and traveled at slower rates of speed. Under these circumstances, the location of the bridge in the arc of the curve did not create a situation nearly as hazardous as we find it to be today. One of the highway experts testified that when the road was widened and hardsurfaced, which was done in 1958, the bridge become a hazard and should have been widened or at the very least, the driving public should have been warned of its existence by the installation of a narrow bridge sign.
The trial judge gave written reasons for finding the defendant negligent and concluded:
"It is the conclusion of the court that the Department of Highways was negligent by allowing a dangerous condition to exist and by not placing a warning sign prior to the approach to the bridge so that travelers may be notified of the potential dangers.
"The cause of the accident was the location of the bridge in the curve and the narrowness of the bridge structure itself. In addition, by having a dangerous condition, the highway needed some type of warning to put drivers on notice. The lack of warning signs was thus a concurring act of negligence."
Defendant contends: (a) the Department of Highways was guilty of no acts of negligence that were the proximate cause of the accident; (b) the decedent Ambrose was guilty of contributory negligence; (c) the negligence of third-party defendant Spurlock in failing to maintain control of his vehicle was the sole cause of the accident; and (d) the trial court's award of damages is excessive.
The duty of the defendant to maintain the highways is set forth in LSA-R.S. 48.21(A):
"The functions of the department shall be to study, administer, construct, improve, maintain, repair, and regulate the use of the state highway system and to perform such other functions with regard to public highways and roads as may be conferred on the department by law."
The duty of defendant to safely maintain the highways for travel was defined in Petree v. Crowe, 272 So.2d 399 (La.App. 2d Cir. 1973) as follows:
"The duty imposed upon a state or its Department of Highways or other appropriate authority is to construct and maintain highways which are reasonably safe for public travel. In the performance of this duty the character of the road and the probable traffic must be kept in view, as the requirement of reasonable safety implies safety for the general or ordinary travel, or use for any lawful or proper purpose.
"The Department of Highways has a duty of maintaining the highways in a safe condition. This includes the duty of providing proper safeguards or adequate warnings of dangerous conditions in the highway. What constitutes proper safeguards and adequate warnings to motorists varies with the dangers presented and should be of such nature that it is commensurate with the danger. The negligence of the Department of Highways may be predicated on its knowledge or information of the existence of a dangerous *55 or defective condition of the highway and subsequent failure to safeguard such condition. See McCallum v. State Department of Highways, supra [246 So.2d 46 (La.App. 3d Cir. 1971)]."
While the Department has the duty as here set forth, due to the vastness of the obligations assigned to it, the following guidelines are set forth in LSA-R.S. 48:192(A):
"The establishment of priorities on a project basis shall be sole responsibility of the board of highways. In fixing priorities, the board of highways shall consider primarily the condition of the roads, streets, and structures making up a part of the state highway system and the relative urgency of the improvements considering in their order general needs, traffic volume, accident records, technical difficulties in the preparation of plans and the procurement of rights of way as well as unforeseeable emergencies such as floods." Emphasis added.
In the decision of Roberts v. Winston Carriers, Inc., 304 So.2d 818 (La.App. 3rd Cir. 1974), it was recognized that the highway department was not necessarily negligent in failing to update an old highway to comply with modern standards:
"She (plaintiff) argues that the highway was too narrow to accommodate that high volume of traffic safely, and that the Highway Department was negligent in maintaining such a narrow thoroughfare in that area. We agree that under modern standards the highway should be wider to accommodate the volume of traffic which uses it. We do not feel, however, that the Department of Highways is liable in damages for having failed to widen the highway or to close it to all traffic before this accident occurred simply because it did not meet modern standards as to width."
Defendant does not seriously contend the bridge is not hazardous. One of defendant's experts admitted the two trucks could not safely pass on the bridge. It argues that because of the low traffic count of only 147 vehicles per day its failure to have earlier replaced the bridge was not negligence and does not result in its being liable for damages because it is impossible for the Department to fix all bridges that are below standard with available funds. The Department established there are 31 bridges located in Jackson Parish with a width of less than 19 feet and 179 bridges located in Highway District 5 (this is the district in which Jackson Parish is located) which have a width of less than 19 feet. There is substantial logic in the Department's contentions and the fact it has failed to give priority to the repair of this bridge may well be within its discretionary right under R.S. 48:192(A). In the decision of Petree v. Crowe, supra, the court stated "in the performance of this duty the character of the road and the probable traffic must be kept in view." This is a recognition the Department is entitled to assign priorities in the performance of its duties. This principle was also recognized in Roberts v. Winston Carriers, Inc., cited supra.
While defendant may have some justification for its failure to earlier reconstruct the bridge in accordance with modern-day standards, can it be said to be also justified in failing to install warning signs which would advise approaching motorists of the narrowness of the bridge? Defendant, pursuant to LSA-R.S. 32:235, adopted a manual of Traffic Control Devices in 1962 which establishes its duty with regard to the installation of warning signs in connection with narrow bridges as follows:
"Narrow Bridge Sign: The W 28 sign shall be used to indicate a bridge having a clear roadway width of 16 to 18 feet, or any bridge having a roadway clearance less than the width of the approaching pavement. In rural areas, it shall be placed not less than 750 feet nor more than 1000 feet in advance of the narrow bridge. In urban areas this distance shall be approximately 250 feet."
"One Lane Bridge Sign: The W 29 sign shall be used to mark all bridges having a clear roadway width of less than 16 feet. It may also be used on bridges having roadway widths of less than 18 feet, when commercial vehicles constitute a *56 high proportion of the traffic or when the alignment approaching the structure is poor. In rural areas, it shall be placed not less than 750 feet nor more than 1000 feet in advance of the bridge. In urban areas, this distance shall be approximately 250 feet." Emphasis added.
Defendant in brief contends the bridge did not require a sign indicating it was a hazard.
Defendant's expert, J. B. Carter, retired State Project Engineer, testified this bridge, constructed in 1928 "began to fall below standards in 1946 after the war." His opinion was necessarily based on the fact that the highway's surface had been improved, vehicles were being constructed wider and traveling faster. The evidence establishes that in 1958 the road was blacktopped and widened and at this time, the bridge was not increased in width. The width of the road approaching the bridge is from 20 to 21 feet. Highway experts established that bridges should be constructed at least the width of the approaching road and shoulders which would require this bridge to be at least 21 feet in width. All bridges presently being constructed in this state have a minimum width of 28 feet. Defendant acknowledged that prior to the accident this bridge had been rated poor and plans had been prepared to reconstruct it. Defendant's engineer explained the rating was because of the bridge's age, narrowness, and the fact its alignment was poor because of the curve on each end of the bridge.
The first regulation above cited would require a narrow bridge sign for the reason the width of the bridge is less than the width of the approaching pavement. The second regulation cited would require a onelane bridge sign because the alignment approaching the structure is poor. The cost of installation of one of these warning signs is minimal. The defendant was well aware of the hazardous condition of the bridge prior to the time of the accident. There is no justification for its failure to have installed the warning signs and its failure to do so is negligence. Dabov v. Allstate Insurance Co., 302 So.2d 697 (La.App. 3rd Cir. 1974); Kilpatrick v. La., Dept. of Highways, 154 So.2d 439 (La.App. 2d Cir. 1963); LeBlanc v. Estate of Blanchard, 266 So.2d 918 (La. App. 4th Cir. 1972).
Defendant contends although it may have been negligent in failing to install a narrow bridge sign, this negligence was not the proximate cause of the accident, for the reason the drivers of the vehicles involved were both familiar with the accident site and needed no warning of the hazard. The evidence does establish that Paul Spurlock traveled over the bridge at least twice a week for several years and on one occasion stopped his vehicle in order to avoid passing an approaching automobile on the bridge. Spurlock admits he knew the bridge was narrow and that was the reason he applied his brakes upon observing the approaching Ambrose vehicle. Even though Spurlock had this knowledge, he may have failed to recall the hazard which he was approaching and for this reason, did not slow the speed of his bus well in advance of his arrival at the bridge approach. If the sign had been installed 750 feet north of the bridge site as required by the manual, it could have reminded Spurlock and caused him to slow his speed well below the 35 or 40 miles per hour which he was traveling in order that he could have safely stopped the bus in the event he met a vehicle at the bridge.
The evidence does not establish Ambrose was aware of the narrow bridge. The trial court found Ambrose had never had occasion to drive a large tractor-trailer rig across this road, and the evidence supports this finding. If a narrow bridge sign had been posted 750 feet south of the bridge, Ambrose would have observed it, reduced his speed as he approached the bridge and been able to avoid the collision. Instead of observing a narrow bridge sign, Ambrose was confronted with a curve sign with a 40 miles per hour speed recommendation thereon, and therefore, had no reason to approach the bridge at a speed of less than 35-40 miles per hour. Ambrose was entitled to presume the highway was safe for normal use.
*57 "The general rule is also well established and recognized in the jurisprudence that a motorist using a public highway has a right to presume and to act upon the presumption, that the highway is safe for usual and ordinary traffic, either in daytime or at night, and that he is not required to anticipate extraordinary danger, impediments, or obstructions to which his attention has not been directed and of which he has not been warned. See Kilpatrick v. State, supra; Falgout v. Falgout, supra [251 So.2d*424 (La.App. 1st Cir. 1971)]; and Reeves v. State, supra [80 So.2d 206 (La.App. 2d Cir. 1955)]." Petree v. Crowe, supra.
The evidence establishes that Ambrose could not have seen the approaching poultry bus until he was within 300 feet of the bridge and at his speed it would have required him from 360 to 420 feet to stop his truck. Therefore, at the time he was able to observe the approaching Spurlock vehicle, it would have been impossible for him to have stopped his 18 wheeler before colliding with the approaching poultry bus which had slid to within 12 feet of the end of the bridge after the collision. Before Ambrose would have made a determination to stop, he would have to determine the bridge was too narrow for the two vehicles to safely pass simultaneously, and he could not have made this determination until he was very near the bridge. There is no evidence that Ambrose was traveling at an excessive rate of speed or that he was not in his proper lane of travel or that he failed to take evasive action which would have avoided the accident. Though Ambrose's truck exceeded by eight inches the eight foot width limitation of R.S. 32:381, this did not contribute to the cause of the accident. The defendant failed to establish that Ambrose was guilty of any contributory negligence.
Defendant asserts because the accident did not occur while the two vehicles were passing each other on the narrow bridge, the absence of the warning signs would not have been the proximate cause of the accident. This rationale fails to take into consideration that the absence of the sign may have failed to remind Spurlock to slow his vehicle on the approach to the bridge, and therefore, its absence was the cause of the hasty locking of the brakes on the bus which caused it to move into Ambrose's lane of travel. This argument also fails to take into consideration that had Ambrose seen the sign, he would have approached the bridge with caution and therefore could have brought his vehicle under control at the time he observed the approaching poultry bus.
The accident which happened here is exactly the kind of accident the installation of narrow or one-lane bridge signs was designed to avoid. The violation of the duty to install the signs contributed to causing the accident which brought about the death of Ambrose. Mixon v. Allstate Insurance Co., 300 So.2d 232 (La.App. 2d Cir. 1974).
Paul Spurlock, because of his familiarity with the location of the narrow bridge and knowledge that it was unsafe for two vehicles to pass on it simultaneously, should have approached the bridge at a slow rate of speed so that he could have brought his vehicle under control in the event he met traffic approaching from the other direction. Spurlock was not entitled to assume the road was safe to travel because he had actual knowledge of the hazardous bridge. Martin v. State, Dept. of Highways, 322 So.2d 827 (La.App. 3rd Cir. 1975). His failure to maintain control of his vehicle under these circumstances was negligence which contributed to the accident.
The Department of Highways may have been justified in failing to widen the bridge and improve its alignment because of the low traffic count on the highway, but the trial court's finding that the Department of Highways was guilty of negligence contributing to the death of Ambrose based upon the failure to install warning signs advising of the hazardous bridge is supported by the record.
The trial court was in error in rejecting the third-party demand against Spurlock because his prior knowledge of the hazard clearly placed him under a duty to approach *58 the site of the accident with care, and his failure to do so directly contributed to the cause of the accident.
Third-party defendant contends if it be found the accident was caused by the joint negligence of the Department and Spurlock, the Department's third-party demand should be rejected because the Department, in its pleadings, did not specifically pray for a contribution from the third-party defendant in the event of solidarily liability. While the pleadings contained in the thirdparty demand are not as articulate as thirdparty defendant would require, they clearly set forth an allegation that the accident was caused by Paul Spurlock and the prayer is as follows:
"4. That on the Third Party Demands, Third Party Defendants be condemned to pay to Third Party Plaintiff any amount it may be condemned to pay to the original plaintiff, plus legal interest and all amounts from judicial demand, and for all costs of these proceedings."
Under the provisions of C.C.P. Art. 2164, we are entitled to render any judgment that is just, legal and proper upon the record on appeal. The record clearly justifies a judgment in favor of the Department of Highways on its third-party demand against Paul Spurlock for one-half of the amount of the judgment against the Department.
We have reviewed the damages awarded the wife and children of decedent and while they are substantial, we find them within the discretion of the trial judge. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
We amend the judgment to award judgment in favor of the Department of Highways and against Paul Spurlock on the third-party demand for one-half of the amount of the judgment rendered against the Department of Highways. All costs, including cost of appeal, are assessed against the defendant, Department of Highways, and against third-party defendant, Spurlock, in solido, subject to R.S. 13:4521, which relieves the defendant Department of Highways, except for stenographic costs.
Amended, and as amended, affirmed.
NOTES
[1] Plaintiffs were awarded the following damages:

The widow was awarded $125,000 for the loss of support and $50,000 for loss of love and affection. The minor, Kimberly Ann Ambrose, age 15 years, was awarded $27,500 for loss of future support and was awarded $30,000 for loss of love and affection. Carol Denise Ambrose, age 12 years, was awarded $30,000 for loss of support and $27,500 for loss of love and affection. Bobby Ambrose, Jr., age 6 years, was awarded $35,000 for loss of support and $25,000 for loss of love and affection.