361 So.2d 957 (1978)
Diane Delaney AINSWORTH and Robert A. Ainsworth, III
v.
Joan Elyse TREADWAY, Volkswagen Insurance Company, Charles Cox, Mrs. Mildred S. Cox, Aetna Casualty & Surety Company, Hanover Insurance Company, Gaines P. Wilson & Son, Inc., Liberty Mutual Insurance Company, A. C. Aukerman Company and the Department of Highways of the State of Louisiana.
VOLKSWAGEN INSURANCE COMPANY and Joan Elyse Treadway
v.
Charles COX, Mrs. Mildred S. Cox, Aetna Casualty & Surety Company, Hanover Insurance Company, Gaines P. Wilson & Son, Inc., Liberty Mutual Insurance Company, A. C. Aukerman Company and the Department of Highways of the State of Louisiana.
Nos. 9324, 9325.
Court of Appeal of Louisiana, Fourth Circuit.
July 26, 1978.
Rehearing Denied September 12, 1978.
Writ Refused October 26, 1978.
*958 Meunier, Martin & Meunier, Richard J. Meunier, Jr., Marcel J. Meunier, Jr., New Orleans, for plaintiffs-appellants, Diane Delaney Ainsworth and Robert A. Ainsworth, III.
O'Keefe, O'Keefe & Berrigan, Peggy M. Vicknair, New Orleans, for defendants-appellees, Joan Elyse Treadway and Volkswagen Ins. Co.
J. Michael Cumberland, New Orleans, for defendant-appellee, Joan Elyse Treadway individually.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, John J. Weigel, G. Bruce Kuehne, New Orleans, for defendants-appellees, Gaines P. Wilson & Son, Inc. and Liberty Mut. Ins. Co.
*959 Philip K. Jones, Marshall W. Wroten, Robert J. Jones, Doran & Kivett, Baton Rouge, for defendant-appellee, The Department of Highways of State of La.
Before GULOTTA, STOULIG and BEER, JJ.
GULOTTA, Judge.
Plaintiff appeals from the dismissal of her suit for damages sustained in an automobile accident. We affirm.
Diane Ainsworth, a guest passenger, was injured when the car in which she was riding was rearended as it came to a stop for a barricade placed in the left lane of I-10 East by the highway contractor who was performing construction work on the median at the site. The left lane had been closed to traffic by means of a "taper", a barricade of alternating barrels and lights set up to channel traffic into the center and right lanes.
Suit was directed against the State Department of Highways, the highway contractor, the host driver and the driver of the rearending vehicle and their respective insurers. Prior to trial, plaintiff settled her claim against the driver of the rearending vehicle for the sum of $125,000.00 but proceeded against the other defendants. The trial judge, adopting the commissioner's findings, concluded "the only cause in fact of this accident was the gross negligence" of the driver of the rearending vehicle.
According to plaintiff, the trial court's conclusion exonerating the host driver and the Department of Highways and its contractor is contradictory. It is plaintiff's contention that either the host driver or the Department of Highways and its contractor are negligent. Plaintiff claims the Department of Highways and the contractor knew that an inordinate number of other accidents and "near misses" had occurred at the site of the lane closure and that confronted with this situation, they were negligent in failing to place more adequate markings to alert motorists properly of the hazard occasioned by the lane barricade. If, on the other hand, adequate warnings were posted, plaintiff claims, the host driver was negligent in making a sudden emergency stop on a well-marked highway indicating the impending closure of the left lane. We do not agree.

DEFENDANT OF HIGHWAYS AND THE CONTRACTOR
The well settled duty of the Department of Highways is to see that roads are reasonably safe for drivers exercising ordinary care and to warn motorists of hazardous conditions. Vervik v. State, Department of Highways, 302 So.2d 895 (La.1974); Barr v. State, Louisiana Department of Highways, 355 So.2d 52 (La.App. 2d Cir. 1978). In this connection, in our case, the Department's agreement with the highway contractor for the construction of the median barrier provides that the contractor is to erect and maintain signs and barriers in accordance with Department standards. The trial court concluded the Department and the Department's contractor had adequately warned the traveling public of the existence of the hazard. The record supports this conclusion.
At the scene of the accident, I-10 East is a three-lane highway running from Jefferson Parish to New Orleans. It passes beneath a railroad bridge then curves, on an incline, to the left. At the time of the collision at approximately 10:15 p. m. on May 14, 1973, the left lane taper closure commenced approximately 300-400' on the southeast side (closer to downtown New Orleans) of the bridge and 1,500' before the Metairie Road overpass.
According to the testimony of employees of the Department and the highway contractor,[1] "Speed Limit 45" signs were posted *960 on both sides of the highway at a point in excess of one half mile before the beginning of the lane taper. Approximately one half mile from the commencement of the taper "Left Lane Closed ½ Mile" signs were placed on both sides of the eastbound highway. Other warning signs indicating 1,500', 1,000' and 500' distances to left lane closure were placed on the highway. Blinking amber lights were located next to the 1,500' and 1,000' signs. The taper closing the left lane consisted of nine 55-gallon drums with reflective tape and 11 continuously-burning amber lights spaced alternately at distances of approximately 33' over a total length of 606'. According to accepted and recognized standards for highway construction, the minimum length for such a taper is 540'. Permanent overhead highway mercury vapor lights illuminated the barricade area. Day and night inspections were made to insure that the taper was properly aligned and that the lights were burning.
The supplier of the warning lights testified that on the morning following the accident all of the lights in the taper were functioning with the exception of four (struck by Treadway's car). Other witnesses working on the scene testified that the first 150-200' of the taper were intact but that several lights and barrels, after that point, were broken and misaligned.[2] Though the drivers of the vehicles involved did not remember any advance warning signs, the trial court simply rejected their statements and accepted the more convincing testimony of the men involved in the construction project. We cannot say the credibility determinations of the trial judge are erroneous.
We reject further plaintiff's claim that an inordinate number of accidents at the scene of the taper required the placing of more adequate warning devices. Support for this contention is simply lacking in proof. Though plaintiff introduced the testimony of a person who was involved in an accident in the same area, the circumstances of that accident were not related in any way to the inadequacy of the construction warning system but rather resulted from traffic congestion. Testimony of an ambulance driver who related another accident earlier on the evening in question, which according to him disrupted the taper, was properly rejected on credibility grounds. Plaintiff's reliance on the testimony of employees of the Department and contractor[3] who observed accidents and near accidents in the course of their workday is equally unpersuasive when viewed in light of the high volume of traffic in the area.[4] Even plaintiff's traffic control and safety expert testified that the warning sign system was "adequate" and that the taper was located in a "logical" place. This expert also conceded that it is impossible to eliminate the element of human frailties of the driving public.
The evidence considered, we conclude the trial judge properly determined that the Department and the contractor had not breached their duties to establish and maintain a safety system to warn the passing motorists adequately of the hazard occasioned by the median construction project.

HOST DRIVER
We are not here concerned with the negligence of the rearending driver. The crucial *961 issue is whether the host driver was negligent (in stopping on an interstate highway and in failing to merge into the center or right traffic lane) and, if negligent, whether that driver is responsible to plaintiff in damages.
Joan Treadway, the host driver of the 1967 Volkswagen in which plaintiff was seated in the rear as a passenger, testified that as she rounded the curb in the left lane of I-10 East and went under the railroad bridge, she suddenly came upon a barricade blocking her lane "about half of a city block" ahead of her. Treadway stated she had not seen any traffic signs, signals or warnings of any kind of the left lane closure. Upon first observing the barricade, she applied her brakes and, without skidding, held the car steady; flashed her emergency lights; and came to a stop or slightly rolling stop a short distance in front of the barricade. She stated after "about one second to feel relief" she was struck in the rear by the vehicle driven by Charles Cox. Her testimony was corroborated by plaintiff.
Cox testified that he had been following the Treadway vehicle in the left lane and was not aware of any construction warning signs or conscious of Treadway's brake lights. He estimated that he had been traveling at a speed of 45-55 miles per hour and, though he thinks he applied his brakes, stated that he had not slowed down appreciably when he struck the car.
Under the doctrine of duty-risk as set forth in landmark Louisiana Supreme Court cases,[5] a determination of negligence involves a two-step process. First, it must be determined whether defendant's conduct was a cause in fact of the harm suffered by plaintiff, i. e., whether defendant's conduct was a substantial factor in bringing about the collision. Second, if defendant's conduct was a cause in fact of the accident, whether this act was a breach of the duty imposed to protect the plaintiff against the particular risk involved.
Applying the doctrine, it is clear that Treadway's stopping of her vehicle in the left lane short of the barricade was a cause in fact of the rearend accident. By her own testimony it is obvious she failed to timely observe the series of signs warning her of the left lane closure. Had she timely done so, presumably she could have merged into the center lane without coming to a stop.
A more difficult question, however, is whether Treadway breached a duty designed to protect her guest passengers against a rearend collision. Clearly, the primary purpose of the left lane closure signs is to prevent a motorist from driving into the construction area where a collision with construction machinery or excavation might result in a serious damage to the motorist as well as to construction workers during working hours. It is the risk of this type of accident that is contemplated by LSA-R.S. 32:237(A).[6]
Not so clear, however, is whether the duty to observe left lane closure signs is designed to guard against the risk of rearend collision from vehicles driven by other individuals who have also failed to heed the signs. Under the circumstances of this *962 case, we think not. Although the host driver did not observe the advance warning signs, she was alert enough to see the construction barricade ahead, bring her car to a controlled stop without striking the barricade, and flash her emergency lights before the rearend impact. The gross intervening negligence of Cox, the rearending driver, who failed to heed the signs, absolves Treadway from liability. Presumably, a careful following driver, aware of the warning signs, would have either brought his vehicle to a controlled stop or merged into the center or right lane, thereby not striking the stopped automobile.
Our case, we think, is closely akin to Laird v. Travelers Insurance Company, 263 La. 199, 267 So.2d 714 (1972). In Laird, a truck driver had stopped his vehicle and was partially obstructing a highway while he conversed with members of a work crew. The truck was rearended. This obstructing truck driver's conduct was in violation of LSA-R.S. 32:141(A)[7] and a cause in fact of the rearend collision. Applying a duty-risk approach, the Louisiana Supreme Court held that the risk of the rearend collision did not fall within the ambit of the statutory duty not to obstruct the highway under the facts in that case. The Laird court indicated that Laird's stopped vehicle did not totally obstruct the lane of traffic; that the following truck driver could have safely passed Laird's vehicle; that Laird had his brake lights on while stopped; that there were road signs warning of the highway construction work in the area; and that one of the members of the work crew had attempted to draw the approaching truck driver's attention to the Laird vehicle. In Laird, the obstructing truck driver was exonerated from liability. The facts in our case are analogous to those in Laird. Under the circumstances, we cannot conclude the trial judge erred in dismissing plaintiff's suit against Treadway. The judgment is affirmed.
AFFIRMED.
STOULIG, J., dissents in part.
STOULIG, Judge, dissenting in part.
I respectfully dissent from that part of the majority opinion that absolves Joan Treadway, the host driver, of liability.
Joan Treadway was driving her automobile on the Pontchartrain Expressway, a major thoroughfare reserved for fast moving non-stop traffic. Before approaching the accident site, had she exercised reasonable care, she could have merged into the unblocked traffic lane as the alternating 11 amber lights and nine 55-gallon reflective taped barrels indicated she should. Her failure to observe the posted warning signs and to maneuver her vehicle to an open lane resulted in her unexpectedly being confronted with an emergency of her own making. She responded by stopping. The following driver, also negligent in failing to observe the indications to change lanes, was confronted not only with the barricade but also the stopped automobile. At this point in time the following driver could do nothing to avoid hitting the Treadway car, stopped only for one second before impact. Thus, the doctrine of last clear chance cannot be applied to absolve Ms. Treadway of negligence. I conclude the negligence of both drivers were contributing proximate causes of the accident.
The majority result is reached via "cause-in-fact/duty-risk" criteria. Unquestionably Ms. Treadway's actions created a situation, without which this accident would not have occurred. As Laird v. Travelers Insurance Company, 263 La. 199, 267 So.2d 714 (1972), might state it, her stopping on an express-way *963 was a "basic ingredient" of this collision. The majority concedes she breached her duty to observe the warnings and respond appropriately; however, it concludes that R.S. 32:237(A) was not enacted to obviate the type of risk to which the injured guest and the following driver were exposed in this case.[1]
It is with this restricted construction of the duty-risk scope of R.S. 32:237(A) that I disagree. Motorists on an expressway expect traffic to move at an accelerated pace non-stop; therefore, markers and barrels designed to channel vehicles from a blocked lane to an open one are placed there to insure a continuous flow of traffic. Non-stop movement is a primary reason for the construction of expressways. Thus, if I project the purpose of the statute at issue as it would apply to interstates and expressways, I can only conclude one of the risks it is designed to eliminate is sudden stop emergency situations. Stated another way, I conclude the risk to which plaintiff and the following driver were exposed by Ms. Treadway's actions is within the ambit of protection to motorists this statute is designed to afford.
I am of the opinion that the Laird case is distinguishable. In proximate cause language, the truck driver's liability is fixed by the last clear chance doctrine. Although the stopped motorist was negligent in parking partially in the moving lane of a highway, contrary to statute, it was the failure of the moving motorist to observe and avoid striking the stopped vehicle, when he had ample time and opportunity to do so, that was the sole proximate cause of the accident. In duty-risk language, the extent of protection afforded by the prohibition of parking on state highways did not include the Laird situation.
Therefore, I would reverse the judgment of the trial court and impose liability on the host driver.

ON APPLICATION FOR REHEARING
PER CURIAM.
In application for rehearing, plaintiff correctly points out that no direct evidence was introduced to support the majority's conclusion that four broken lights in the taper had been struck by the Treadway vehicle.[1] This conclusion in the majority opinion was based not upon direct but circumstantial evidence in the record which indicates that the point of collision of the vehicles occurred in the area of disturbance in the taper.[2] While there is merit to plaintiff's observation, the effect does not change the result reached by the majority.
Likewise, plaintiff properly corrects an inaccuracy in the following language of the majority opinion regarding an accident occurring prior to the Treadway collision:
"Though plaintiff introduced the testimony of a person who was involved in an accident in the same area, the circumstances *964 of that accident were not related in any way to the inadequacy of the warning system but rather resulted from traffic congestion. Testimony of an ambulance driver who related another accident earlier in the evening in question, which according to him disrupted the taper, was properly rejected on credibility grounds."
As pointed out by plaintiff, the use of the word "another" in the above language implies that two different accidents occurred before the Treadway collision. In truth and in fact, only one prior accident occurred.
We point out further that the majority opinion seems to indicate the trial judge rejected the testimony of the ambulance driver that this accident had occurred. That the accident took place is undisputed. The meaning intended to be conveyed by the majority, however, was that the trial court properly did not place great weight on the driver's testimony regarding his description of the outbound I-10 taper.[3] Though this inaccuracy likewise has no effect on the final disposition of the case, we feel that the loose and ambiguous phrasing of the majority opinion requires that an attempt be made at clarification.
Accordingly, the petition for rehearing is denied.
PETITION DENIED.
NOTES
[1] Employees testifying with regard to the signs and/or taper included: John Laporte (inspector for the Department of Highways); Darrel Ledoux (project engineer for the Department); David Mize (safety engineer for the contractor, Gaines P. Wilson & Son, Inc.); John Calhoun (vice president for the contractor); and Robert Bullock (road foreman for the contractor). Their testimony was corroborated by a daily-maintained "sign diary" prepared at an unsuspicious time.
[2] Laporte testified that three lights and three barrels were out of alignment. Ledoux stated that "several" lights and barrels within the first half of the taper near the middle were in disarray. Mize testified that 200' at the beginning of the taper were unaffected but that three or four lights and three or four barrels were out of alignment. Bullock stated that four to five barrels and lights were disturbed at a point 150' from the commencement of the taper.
[3] Laporte, Ledoux and Mize.
[4] The daily traffic count at the scene (I-10 East and West) was estimated at 86,200 vehicles. Over the 21-day period the left lanes of I-10 East and West were closed, about 1,600,000 vehicles would have passed the construction area.
[5] Dixie Drive It Yourself System New Orleans Co. v. American Beverage Company, 242 La. 471, 137 So.2d 298 (1962); Pierre v. Allstate Insurance Company, 257 La. 471, 242 So.2d 821 (1970); Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972).
[6] LSA-R.S. 32:237(A) provides:

§ 237. Barricades, signs and signals; prohibition against tampering with and violating instructions; exceptions
"A. No one shall in any way tamper with, move, damage, or destroy any barricade, signs or signals placed upon any highway by the department or by any contractor or subcontractor doing highway construction or repair work under or by authority of the department, nor shall any person disobey the instructions, signals, warnings, or marking of any warning signs, signals, or barricades so placed upon any highway under construction or being repaired nor shall any person drive around or through any barricade or fences placed upon any closed highway by the department or any contractor or subcontractor doing highway construction or repair work under or by authority of the department, unless at the time otherwise directed by a police officer."
[7] LSA-R.S. 32:141(A) provides:

§ 141. Stopping, standing or parking outside business or residence districts.
"A. Upon any highway outside of a business or residence district, no person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the paved or main traveled part of the highway when it is practicable to stop, park or so leave such vehicle off such part of said highway, but in every event an unobstructed width of the highway opposite a standing vehicle shall be left for the free passage of other vehicles and a clear view of such stopped vehicles shall be available from a distance of two hundred feet in each direction upon such highway."
[1] The majority opinion states in part: "Clearly, the primary purpose of the left lane closure signs is to prevent a motorist from driving into the construction area where a collision with construction machinery or excavation might result in serious damage to the motorist as well as to construction workers during working hours. It is the risk of this type of accident that is contemplated by LSA-R.S. 32:237(A)."
[1] The majority opinion states: "The supplier of the warning lights testified that on the morning following the accident all the lights in the taper were functioning with the exception of four (struck by Treadway's car)."
[2] Based on the testimony of John Montecino, an investigating police officer, the point of impact of the vehicles can be calculated at a distance of 1,350 feet from the Metairie Road overpass. Darryl Ledoux, Project Engineer for the State Department of Highway's, testified that the taper began at the distance of 1,500 feet from the overpass. Based on this testimony, the point of collision would have been 150 feet into the taper.

As noted in footnote 2 in the majority opinion, David Mize, the contractor's safety engineer, stated that on the morning after the Treadway accident 200 feet at the commencement of the taper were unaffected but that three or four lights and three or four barrels were in disarray thereafter. Robert Bullock, the contractor's road foreman, testified that four to five barrels and lights were disturbed at a point 150 feet from the beginning of the taper. As previously stated, the supplier of the warning lights testified that four lights were not functioning on the morning following the accident.
[3] The Commissioner's observations, apparently adopted by the trial judge are as follows:

"Mr. John Whitney Jr., an ambulance driver, was called by Plaintiff and testified that he was quite familiar with the scene of the accident and with roadway and traffic conditions. Mr. Whitney stated that the barrels were yellow when in fact they were black. He stated that there was no left lane closure on the outbound lanes of traffic and had stopped his ambulance in the median section on the outbound lane. All witnesses testifying on this matter contradicted Mr. Whitney and stated that the left lane for outbound traffic was closed by barricades."